Filed 7/28/22  In re D.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.H., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078731 |
| Plaintiff and Respondent, | (Super.Ct.No. J287146) |
| v. | OPINION |
| D.H., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Kaleigh Ragon, Deputy County Counsel, for Plaintiff and Respondent.

1

D.H. (father) appeals from an order terminating parental rights to his son, D.H., Jr. (the child). The sole issue father raises is lack of compliance with the Indian Child Welfare Act of 1978, or ICWA (25 U.S.C. § 1901 et seq.) and Welfare and Institutions Code[1] section 224 et seq. We affirm.

### PROCEDURAL BACKGROUND

The San Bernardino County Children and Family Services (CFS) filed a section 300 petition on November 2, 2020, as to the child, who was only a few days old at the time. The petition alleged that he came within section 300, subdivision (b) (failure to protect), in that father and the child's mother, L.C. (mother)[2] had substance abuse problems, engaged in domestic violence, and failed to provide a safe and appropriate living environment for the child. The petition also alleged that father had a criminal history and failed to address his mental health issues.

The court held a detention hearing on November 3, 2020. The court asked mother if she had any Native American ancestry, and she said she had a little Cherokee Indian on her father's side, but it was "just a very small percentage." She said neither she nor her father were enrolled tribe members. She believed her grandfather was, but he passed away. Mother identified father as the child's father, but said she was not married. Father was not present, and mother said she was not sure where he was. The court detained the child.

_____

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

[2] Mother is not a party to this appeal.

2

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on November 19, 2020, recommending that the court sustain the petition, remove the child from father and mother (the parents), and order reunification services for them. The social worker reported that the parents claimed to have Cherokee and Chippewa ancestry on October 28, 2020. She also reported that mother and the child tested positive for drugs at the child's birth, and mother admitted to using methamphetamine four to five days prior. The social worker reported that the parents were staying in motels with vouchers, and CFS attempted to reach them multiple times concerning their case. When father finally called, he refused to speak with the social worker.

The court held a jurisdiction/disposition hearing on November 24, 2020. Mother was present by telephone and reported that she and father were recently involved in a domestic violence dispute, and he was arrested by the police and was currently in custody. County counsel asked the court to find that ICWA did not apply since there was no reason to believe the child was an Indian child. She noted that neither parent nor any relatives CFS had spoken with on either side of the family claimed that the parents or the child were enrolled tribal members. Subsequently, the court stated the bailiff was able to confirm that father was in custody. The court then stated it would continue the matter to the following day and appoint counsel for father. The next day, counsel for father was present and reported that father was in custody and under quarantine. Counsel acknowledged receipt of the petition and objected to detention. The court continued the hearing to allow father to be transported.

3

The continued hearing was held on December 11, 2020, and father's counsel again stated father was in local custody and still under quarantine. Thus, the court continued the hearing again.

On December 21, 2020, CFS filed an ICWA Declaration of Due Diligence, reporting that it had sent notices to the Bureau of Indian Affairs (BIA), the Eastern Band of Cherokee Indians (Eastern Band), the Cherokee Nation of Oklahoma (Cherokee Nation) and the United Keetoowah Band of Cherokee Indians of Oklahoma (United Keetoowah) on December 14, 2020, and was awaiting responses. The ICWA-030 forms sent to the BIA and the tribes provided the parents' names, birthdates and birthplaces, and former addresses; the maternal and paternal grandparents' names, current and former addresses, and birthdates and birthplaces; the maternal great-grandparents' names, former address, and birthdates and birthplaces; the paternal great-grandmother's name, current and former address, birthdate and birthplace; and the paternal great-grandfather's name and birthdate. The forms stated, "No information available" for the information that was missing.

The court held a continued jurisdiction/disposition hearing on January 5, 2021, and father's counsel noted that father was still in custody and was not transported due to medical reasons. The court once again ordered father to be transported and continued the hearing to January 22, 2021.

On January 13, 2021, CFS filed another ICWA Declaration of Due Diligence, reporting that it had received signed proofs of service of the ICWA notice forms from the BIA and two of the three noticed Cherokee tribes, but no confirmation of membership.

4

At the hearing on January 22, 2021, father's counsel stated father was not present, and confirmed that he was no longer in custody. Both counsel for father and mother both objected to the allegations with no affirmative evidence and submitted on the disposition. County counsel asked the court to make a finding that ICWA did not apply and that there was no reason to know the child was an Indian child. She stated the information CFS had was that both parents said they may have Native American ancestry, which meant they were not even sure about their ancestry and they were not alleging they were members of a tribe or that the child was a member or eligible for membership. The court found the allegations true and that the child came within section 300, subdivision (b). It then found that notice had been given as required by law, that ICWA did not apply, and that there was no reason to know the child was an Indian child. The court declared father the presumed father, declared the child a dependent, removed him from the custody of the parents, and ordered reunification services.

On March 17, 2021, the court signed the ICWA Findings and Orders form stating that the required 65-day period of time since noticing was received by the BIA, and the indicated tribes had passed with no affirmative response of tribal membership received. The form indicated the Eastern Band and the United Keetoowah had stated the child was not enrolled, and the tribe would not intervene. The court thereby ordered that ICWA did not apply and no further notice was required.

*Six-month Status Review*

The social worker filed a six-month status review report on July 9, 2021, and recommended that the parents' services be terminated and the court order foster care with

5

a permanent plan of placement with a fit and willing relative. The social worker reported that father had not been in contact with CFS and his current whereabouts were unknown. On June 29, 2021, the social worker was informed by the probation department that he was currently on bench warrant status due to noncompliance.

The court held a six-month review hearing on July 22, 2021. Both parents were represented by counsel, but neither parent was present. Counsel for the child requested the court to set a section 366.26 hearing and order an adoption assessment to be done for the child with his current caretaker, who wanted to adopt him. Both counsel for mother and father objected to the termination of services and to the setting of a section 366.26 hearing. The court noted the evidence showed that neither parent had participated in services, that the child was under one year old, and that he was adoptable. The court terminated services and set a section 366.26 hearing for November 19, 2021.

*Section 366.26*

The social worker filed a section 366.26 report dated November 19, 2021, recommending that parental rights be terminated and a permanent plan of adoption be implemented. The report noted that the child had been placed with the prospective adoptive parents since birth. The social worker reported that mother only had sporadic contact with the child, and she visited the child approximately once a month. The social worker reported that father was incarcerated in Michigan and had not had any contact or visits with the child.

The court held a section 366.26 hearing on November 19, 2021. Father was not present, as he was incarcerated out of state, but he was represented by counsel. The court

6

noted that father's counsel needed to send a letter to father, and that county counsel was asking for a continuance to ensure ICWA compliance. The court continued the matter to December 17, 2021.

On December 16, 2021, the social worker filed a memorandum with additional information for the court (CFS 6.7). She reported that she attempted to contact mother on several different occasions in order to follow up on information regarding her relatives. The social worker attempted to contact mother on three separate cell phone numbers she had used over the past six months but had not received a call back. Mother's whereabouts were currently unknown, and she had not attended a visit with the child since October 27, 2021. On December 14, 2021, the social worker spoke with child's maternal great aunt (MGA). According to the MGA, it was rumored in her family that her great-grandmother had been "stolen off a reservation." The MGA reported that she completed DNA testing the prior year, and it came back indicating that she had 1 percent Cherokee. The MGA reported that there was no Chippewa in their bloodline.

The social worker further reported that on December 2, 2021, she sent a letter to father at the Allegan County Jail regarding his claim of Native American ancestry, with an attached copy of the ICWA-030. She asked him to provide as much information as possible regarding his relatives. On December 14, 2021, the social worker contacted the Allegan County Jail and was informed that father was no longer in custody and that he was released on October 1, 2021.

The social worker also reported that a final ICWA due diligence report was completed on March 17, 2021, which stated that CFS received a response from the

Eastern Band and United Keetoowah indicating the child did not qualify for membership. On December 15, 2021, the social worker attempted to contact those two tribes, as well as the Cherokee Nation and the BIA, to further follow up on the child's eligibility status. She left voicemail messages for each tribe requesting a call back. That same day, the social worker received an email response from the Cherokee Nation indicating the child was not an Indian child. The social worker also received an email response from the Eastern Band confirming that the child was not eligible for enrollment in their tribe and confirming that a response letter was previously sent on February 3, 2021. As of the writing of the memorandum, the social worker had not received a response from the United Keetoowah or the BIA.

The court held a further section 366.26 hearing on December 17, 2021, and noted there were many issues going on, including ICWA and father being incarcerated out of state. The court instructed father's counsel to set up a video call, if father's prison had the capability, and it noted that county counsel wanted to continue the matter for ICWA inquiry. The court then set the matter for further hearing on February 1, 2022.

Father appeared by telephone at the hearing on February 1, 2022. County counsel indicated she was still awaiting a CFS 6.7 report with information from the Indian tribes that were contacted since December. She also stated her understanding that father was now indicating he might have Blackfeet ancestry. Thus, county counsel asked for a continuance to file the 6.7 report. The court confirmed with father that he once indicated he perhaps had Cherokee ancestry. The court then asked if he also indicated Blackfeet ancestry, and he said yes. Father stated that he was not an enrolled member of any tribe,

8

his ancestry was through his grandmother's side of the family, and he believed it would be through his great-grandmother. Father said he did not know her name and would need to get hold of his grandmother to get it. He said his grandmother's name was K.D.H. (the paternal great-grandmother) and her birthdate was March 13, 1949, and he provided her phone number. County counsel then noted that at the beginning of the case, father indicated he may have Chippewa ancestry. The court asked father directly if he had Chippewa ancestry, and he said, "To be honest with you, I know there was a bunch of Indian ancestry in my DNA through what my grandma told me. But you would have to call her to figure out the actual tribes and all that information because I'm not really a hundred-percent honest." Father said he believed he might have Indian ancestry "strictly based on what [his] grandmother had told [him.]" County counsel then asked for a continuance to contact father's grandmother, and the court set the hearing for March 10, 2022.

On March 9, 2022, the social worker filed another CFS 6.7 memorandum stating that she talked with the paternal great-grandmother (PGGM) on February 17, 2022. The PGGM reported that father was in foster care, and she had adopted him. According to her, "the court for father had determine [*sic*] whether [father] had Native American Ancestry but did not find anything." The PGGM reported that she spoke to her cousin regarding their great-great-grandmother Mary, whom they were told grew up on a Cherokee Reservation. According to the PGGM, no one knew if her great-great-grandmother was actually Cherokee or just raised on a Cherokee reservation. The PGGM reported that her cousin said she took a DNA test, and it came back with no Native

9

American ancestry.  Furthermore, the PGGM said she did not recall ever telling father that he had Chippewa or Blackfeet ancestry, and she did not know where he would get that information.  She also said she did not have knowledge of any other Native American ancestry and did not believe that her great-great-grandmother Mary was Cherokee.

The social worker reported that on March 4, 2022, she emailed a total of 21 Chippewa tribes and the Blackfeet tribe.  That same day, she received an email from the Little Shell Tribe of Chippewa Indians of Montana indicating the child was not an enrolled member.  On March 7, 2022, she received a letter from the Minnesota Chippewa Tribe indicating that the child was not an enrolled member of that tribe or six other enumerated Chippewa tribal nations.  The social worker reported that all other correspondence was pending.

The court held a section 366.26 hearing on March 10, 2022, and father was present by phone and represented by counsel.  County counsel asked the court to find that ICWA did not apply.  County counsel stated that CFS made multiple efforts to obtain and clarify information from mother regarding any Native American ancestry, but that mother had not responded to its efforts.  CFS did speak with the MGG in December, and she indicated there was no Chippewa ancestry in the family and that it was only a family rumor of possible Cherokee ancestry.  Despite that information, CFS continued with informal inquiry again by contacting the Cherokee Tribe and the BIA, but CFS never received any response indicating the child was a member or eligible for membership with the tribe.

County counsel further reported that CFS made multiple efforts to contact father, and father appeared at the last hearing and indicated he may have Blackfeet, Cherokee, and Chippewa ancestry, based on what his grandmother told him. However, CFS contacted the PGGM, and she said that father was adopted, and it was determined through that process that he did not have Native American ancestry. The PGGM also said there was a family rumor that there was a great-great-grandmother who may have lived on a Cherokee reservation, but the PGGM did not believe she was Cherokee. The PGGM also indicated she did not give father the information he alleged about his Native American ancestry. Nonetheless, out of an abundance of caution, CFS still contacted all the federally recognized tribes named by father, and it did not receive any affirmative responses indicating the child or father were enrolled members or eligible for membership. County counsel pointed out that the relatives who mother and father said had the most information about the family's heritage did not believe they had Indian ancestry. Even so, CFS went above and beyond in its affirmative duty and contacted each tribe in an effort to do further informal inquiry. None of the other counsel wished to be heard on the ICWA issue.

The court found that CFS had gone above and beyond its duty to inquire and attempt to give notice to any tribes that were mentioned, and there was "no reason to know, believe, or suspect that this child [was] an Indian child." Thus, the court found that ICWA did not apply. It then terminated parental rights.

DISCUSSION

CFS Complied with ICWA

Father claims that, shortly before the section 366.26 hearing on March 10, 2022, he confirmed that he may have Cherokee, Blackfeet, and Chippewa ancestry, and CFS failed to adequately notice those tribes. He asserts that the social worker "attempted to contact" those tribes, including by email, but did not "disclose whether *adequate* information was included in the notices." He further complains that the email notice to the Blackfeet tribe was untimely, since it was sent merely six days before the March 10 hearing. Thus, the court erred in finding that ICWA did not apply. We find no error.

A. *Requirements Under ICWA*

The juvenile court and CFS have "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9, 11-12.) In conformance with federal ICWA regulations adopted in 2016, the California Legislature amended several sections of the Welfare and Institutions Code regarding ICWA notice and inquiry requirements, effective January 1, 2019. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.) The 2019 amendments specify the steps the juvenile court and CFS "are required to take in determining a child's possible status as an Indian child." (*Ibid.*)

The continuing duty of the court and CFS "can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).)

12

The initial duty to inquire requires CFS to ask the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is, or may be, an Indian child. (*D.F.*, *supra*, 55 Cal.App.5th at p. 566.) It also requires the juvenile court to ask the parents and all other participants at their first appearance whether they know or have reason to know that the child is an Indian child. (*Ibid.*; § 224.2, subds. (b) & (c); Cal. Rules of Court, rule 5.481(a)(1) & (a)(2).)

The duty of further inquiry is triggered when CFS or the juvenile court has reason to believe, but does not have sufficient information to determine there is reason to know, that the child is an Indian child. (*D.F.*, *supra*, 55 Cal.App.5th at p. 566; § 224.2 subd. (e).) "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224, subd. (e)(1).) Further inquiry includes interviewing the parents and extended family members to gather the information, contacting BIA and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility. Contact with a tribe includes "telephone, facsimile, or electronic mail contact to each tribe's designated agent" and shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case. (§ 224.2, subd. (e)(2)(A)-(C).)

13

Once CFS or the juvenile court "has a *reason to know* an Indian child is involved, notice pursuant to ICWA must be sent to the pertinent tribe(s) via registered or certified mail. [Citation.] The notice must contain sufficient information to enable the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership.' [Citation.] The required information includes the names, birth dates, birthplaces, and tribal enrollment information of the parents and other direct lineal ancestors of the child, such as grandparents." (*D.F.*, *supra*, 55 Cal.App.5th at p. 568; see § 224.3, subd. (a)(1) & (a)(5)(C).)

We review a court's ICWA findings for substantial evidence. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 885 (*Austin J.*); *In re Charlotte V.* (2016) 6 Cal.App.5th 51, 57 (*Charlotte V.*).) " 'We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.' " (*D.F.*, *supra*, 55 Cal.App.5th at p. 565.) The appellant " 'has the burden to show that the evidence was not sufficient to support the findings and orders.' " (*Austin J.*, at p. 885.)

B. *CFS and the Court Complied with Their Duties*

We first must determine whether, as a result of the initial inquiry, CFS or the juvenile court had "reason to believe" the child was an Indian child requiring further inquiry of possible Indian heritage. If further inquiry was required, we then determine whether CFS and the juvenile court had "reason to know" the child was an Indian child, necessitating formal notice to pertinent tribes. (*D.F.*, *supra*, 55 Cal.App.5th at p. 568.)

Here, at the initial inquiry stage, father and mother stated on October 28, 2020, that they may have Indian ancestry in the Cherokee and Chippewa tribes. This claim triggered CFS's duty to further inquire, since it had a "reason to believe" the child was an Indian child. At the further inquiry stage, CFS was required to interview the parents and extended family members to gather information, as well as contact the BIA and the State Department of Social Services for assistance in identifying the contact information of the potential tribes, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility. At this stage, CFS was only required to contact the tribes by phone or email. (§ 224, subd. (e)(2)(A)-(C).) The social worker attempted to interview the parents; however, they did not keep in contact with CFS, and the social worker unsuccessfully tried to reach them many times. When father did call, he refused to speak with the social worker. The record reflects that somehow CFS obtained some information about the parents' families and sent ICWA notices to the BIA, the Eastern Band, the Cherokee Nation and the United Keetoowah, on December 14, 2020. The ICWA notices provided the parents' names, birthdates and birthplaces, and former address; the maternal and paternal grandparents' names, current and former addresses, and birthdates and birthplaces; the maternal great-grandparents' names, former address, and birthdates and birthplaces; the paternal great-grandmother's name, current and former address, birthdate and birthplace; and the paternal great-grandfather's name and birthdate.

The record shows that on January 13, 2021, CFS reported that it had received signed proofs of service of the ICWA notice forms from the BIA and two of the three

15

noticed Cherokee tribes, but no confirmation of membership. Thus, at the January 22, 2021 jurisdiction/disposition hearing, the court found that notice had been given as required by law, that ICWA did not apply, and that there was no reason to know the child was an Indian child. On March 17, 2021, the court found that the required 65-day period since noticing was received had passed, with no affirmative response of membership. The court thereby ordered that ICWA did not apply, and no further notice was required. Even so, on December 2, 2021, the social worker attempted to gather more information by sending father a letter at the county jail where he was being held.

Furthermore, in compliance with its affirmative and continuing duty to inquire under ICWA, county counsel requested a continuance to ensure compliance with ICWA, at the initial section 366.26 hearing on November 19, 2021. The social worker spoke with the MGA, who said it was rumored in their family that her great-grandmother had been "stolen off a reservation." The MGA further stated that she completed a DNA test the prior year which indicated she was 1 percent Cherokee. She reported that there was no Chippewa in the family's bloodline. Accordingly, there was no reason for the social worker to believe the child had any Chippewa ancestry.

Subsequently, on March 17, 2021, the social worker reported that CFS received a response from the Eastern Band and United Keetoowah tribes indicating the child did not qualify for membership. Nonetheless, on December 15, 2021, the social worker still attempted to contact those two tribes, as well as the Cherokee Nation and the BIA, to follow up on the child's eligibility status. She left voicemail messages for each tribe requesting a call back. The Cherokee Nation responded and indicated that the child was

16

not an Indian child and the Eastern Band responded and confirmed that the child was not eligible for enrollment. Thus, there was no reason to believe the child had Cherokee ancestry.

Father's claims on appeal appear to be focused on CFS's notice to the Blackfeet and Chippewa tribes. At the hearing on February 1, 2022, he indicated he might have Blackfeet ancestry. He stated he was not an enrolled member of any tribe and admitted that his claim of possible Indian ancestry was based solely on what his grandmother told him. Accordingly, the social worker followed up with the PGGM, who reported that father was in foster care, and she adopted him. The PGGM also indicated that the court, at that time, determined father did not have Native American ancestry. The PGGM further said she did not recall ever telling father he had Blackfeet or Chippewa ancestry. In view of this information, there was no reason to believe the child had Blackfeet or Chippewa ancestry. (*Austin J.*, *supra*, 47 Cal.App.5th at p. 888 ["Information about a tribal connection that 'is too vague, attenuated and speculative' will not support a 'reason to believe the children might be Indian children.' "].)[3] Even so, the social worker *still* emailed 21 Chippewa tribes and the Blackfeet tribe to inquire about the child's possible Indian ancestry. She received responses indicating that the child was not an enrolled member of eight of the Chippewa tribes.

In view of all these efforts, it is clear that CFS went above and beyond its duties under ICWA. The social worker properly contacted and interviewed the parents'

---

[3] This rule applies equally with respect to the "family rumor" of Cherokee ancestry.

17

relatives who had knowledge of their family's ancestry, and based on the information gathered, the court and CFS had no reason to know the child was an Indian child. Moreover, even though not required, CFS sent formal ICWA notices to the BIA and three Cherokee tribes. Those entities either responded and denied membership or failed to respond within the required 65-day limit. Thus, no further action was needed.

As to father's claims that the court relied on "woefully ineffective notifications" in finding that ICWA did not apply, such claim has no merit. He specifically asserts that the social worker attempted to contact the Chippewa and Blackfeet tribes by voicemail and email, but failed to identify the information she provided to those tribes. Father appears to be referring to the Chippewa tribes, as he asserts that the response letter received from the Minnesota Chippewa tribe reflects that his and the child's birthdates were listed as "unknown," and he infers that the social worker omitted that information. Father also points out there was no evidence the social worker sent the ICWA-030 forms to the Chippewa tribes. It is not clear why the letter to the Minnesota Chippewa indicated the birthdates were unknown; however, even if the social worker did not include that information when she contacted the tribe, such omission was immaterial, since there was no reason to believe the child had Chippewa ancestry. The social worker contacted the Chippewa tribes *after* the MGA reported there was no Chippewa in mother's bloodline,

18

father admitted he did not know if he had Chippewa ancestry, and the PGGM reported she did not recall ever telling father he had Chippewa ancestry.[4]

Father additionally claims that the social worker was required to notify the Chippewa and Blackfeet tribal representatives "by registered or certified mail with return receipt requested," but instead only attempted to contact them by voicemail or email. He further argues the court was not authorized to proceed with the March 10, 2022 section 366.26 hearing, since such proceeding was not to be held "until at least 10 days after *receipt* of notice," and there was no evidence the tribal representatives received the social worker's attempts to contact them. Father cites the notice requirements in section 224.3 in support of these claims. However, section 224.3 provides the notice requirements when the social worker "knows or has reason to know" an Indian child is involved. (§ 224.3, subd. (a).) The social worker had no reason to *believe*, much less reason to *know*, the child had Chippewa or Blackfeet ancestry. Thus, the requirements of section 224.3 did not apply.

In sum, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference, and resolving all conflicts in support of the order, we conclude that CFS complied with its duties, and

---

[4] In his reply brief, father again argues that the ICWA-030 notices were not mailed to representatives of the Chippewa tribe, despite him identifying that tribe as a possible source of his Indian ancestry early on. However, when later asked if he was still claiming Chippewa ancestry, father admitted that he was not sure what Indian ancestry he had and his belief was based on what the PGGM told him. As discussed, the PGGM said she did not recall telling father he had Chippewa ancestry and did not know where he got that information. Thus, there was no reason to believe father had Chippewa ancestry.

the court properly found ICWA did not apply.  (See *Charlotte V.*, *supra*, 6 Cal.App.5th at p. 57.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

RAMIREZ
P. J.

MILLER
J.